THE STATE OF KANSAS V. JOHN KEEFE.

| 54 | 197 |
| 60 | 768 |
| 54 | 197 |
| 63 | 182 |
| 54 | 197 |
| 64 | 663 |
| 54 | 197 |
| 65 | 546 |
| 54 | 197 |
| 69 | 585 |
| 54 | 197 |
| 74 | 213 |
| 74 | 801 |

1. WITNESS — *Impeachment.* In a criminal prosecution, the state has no right to impeach the general character for truth and veracity of one of its own witnesses.

2. PROSECUTION FOR MURDER — *Declarations of Defendant's Son.* On a trial for murder, it is not permissible for the state to prove, ostensibly for the purpose of impeaching the defendant's son (who was one of the state's own witnesses, and testified that he heard the fatal shot), that he thereupon exclaimed, "Father has killed George Astley," where such statement was denied by the son, and, if in fact made, was not within the sight or hearing of the defendant, and where there is no claim that the son was connected with the commission of the crime.

3. UNAUTHORIZED DECLARATIONS — *Incompetent Evidence.* The rights of a defendant in a criminal action should not be prejudiced by the unauthorized declarations of another person made out of his sight and hearing, and such unauthorized declarations do not become competent nor admissible merely because denied by the person who is alleged to have uttered them. The admission of such statements, and the comments of counsel thereon, were highly prejudicial to the defendant in this case.

4. SELF-DEFENSE — *Character of Deceased.* Where a defendant on trial under a charge of murder introduces evidence fairly tending to show that he was assaulted by the deceased in such manner as to occasion reasonable apprehension of great bodily harm, which the deceased was apparently in a position to presently inflict, and where the evidence renders it doubtful whether the defendant acted in self-defense in taking the life of the deceased, the defendant should be permitted to show the character of the deceased as to ferocity, brutality, or vindictiveness.

5. CASES, *Followed.* The rule of law with reference to the right of a party who is threatened with great personal injury to defend himself, as declared in the cases of *The State v. Horne,* 9 Kas. 120; *The State v. Howard,* 14 id. 174; *The State v. Bohan,* 19 id. 55, approved.

6. GOOD CHARACTER of *Defendant — Questions for Jury.* The defendant in a criminal action who has introduced testimony showing his previous good character has the right to have such testimony considered by the jury in determining whether reasonable doubt exists as to his guilt. If, from all the other evidence in the case, the jury would be satisfied of the guilt of the defendant, they must still determine whether or not the previous good character of the defendant, when weighed with all the other facts and circumstances in the case,

raises a reasonable doubt as to his guilt. And if such reasonable doubt remains in the minds of the jurors, they must acquit. Of the weight of such testimony and the effect to be given to it, the jury alone must judge.

*Appeal from Kingman District Court.*

JOHN KEEFE was convicted of murder in the second degree. He appeals. The opinion herein, filed November 10, 1894, states the material facts.

*John E. Lydecker, W. E. Stanley,* and *Hay & Hay,* for appellant.

*John T. Little,* attorney general, and *C. W. Fairchild,* county attorney, for The State.

The opinion of the court was delivered by

ALLEN, J.: The defendant appeals from a conviction of murder in the second degree. He was charged with having killed George B. Astley, on the 23d day of December, 1893, at Murdock, in Kingman county. The defendant was a witness in his own behalf. He testified, in substance, that, in company with the deceased and others, he was playing cards in Mustoe's barn. During the game the deceased offered to bet that he could name three cards in the defendant's hand. The parties did not bet, however, at first. Afterward the defendant testified to having made a bet to the same effect of $10; that the deceased named the first two cards, but failed on the third; and that the deceased thereupon grabbed the money off the board they were playing on, and kept it. The defendant then claimed that he had not won the money, and asked him to give it back, but this he refused to do. It appears that the defendant and his son Johnnie then drove to their home, about three miles south of Murdock. After supper they hitched a horse to a road cart, and again went to Murdock. As they drove in past the depot, the defendant got out of the cart, and went to the depot. His son Johnnie drove on up the street, and hitched the horse at Furrow's store. He then went down to the depot, and in company

with his father started to go back up the street. After going a few steps they met Astley going toward the depot. Johnnie Keefe went on up the street, and the defendant stopped to talk with Astley. According to the testimony of the defendant, he asked Astley for the money. The two sat down on the platform together, and the defendant offered that, if the deceased would give him half of the money, he could keep the other half. To this he stated that Astley replied, "If you ever ask me for that, I'll burst your brains out;" that the deceased then stepped back, picked up something, he did not know what, and came toward him with his hand raised; that the defendant then stepped back, pulled out his pistol, and said, "George, don't come up here; stand back;" that when Astley was within three or four steps of him, he shot. Astley then went and knocked on the window of the depot, and then went in at the door, and lay down in the depot, where he soon afterward died. The defendant went and got the horse and cart and drove home.

The first witness called by the state was Johnnie Keefe, who testified concerning what he saw and did on the day of the tragedy. He was cross-examined at length, and on cross-examination testified, among other things, that his father had his pistol in his pocket when he went to town in the afternoon, and appeared to be in good humor at the time he got out of the cart to go to the depot. On reëxamination, he testified that, at the time the fatal shot was fired, he was standing in the east end of Furrow's store; that there were a number of other persons there at the time; that he heard a shot fired. He was then asked:

"Q. I'll ask you this question now, if, when the shot was fired, and you heard it, if you didn't understand what that shot meant?"

This question was objected to by the defendant, the objection was overruled, and witness answered: "No, sir."

"Q. I'll further ask you if you didn't state to Mr. Lucas, as soon as you heard that shot fired, in words as follows, in substance: 'Father has shot George Astley.' A. No, sir."

This question was also objected to, and the objection over-ruled. Afterward, the same witness was again recalled, and asked with reference to a conversation with one Evans, near the hardware store, on the night of the shooting. He was then asked:

"Q. I'll ask you if you did n't make this statement to Milt. Evans, in substance, after this question was asked you: 'Johnnie, do n't you know what your father has done?' 'Yes, but the old man is so high tempered I could do nothing with him; I tried to get his revolver, but could not'? A. No, sir."

This question was also abjected to, and the objection over-ruled. Lucas and Evans were called as witnesses by the state, and, over the objection and exception of the defendant, testified with reference to these conversations. Lucas was asked: .

"Q. I'll ask you the question in this way: I'll ask you if, at that time, which was the time the shot was fired, if Johnnie Keefe did n't state to you, in words as follows, to wit: 'Father has killed George Astley'? A. Yes, sir; he did state that."

Evans was asked:

"Q. I'll ask you if he did n't at that time, in answer to your question, 'Johnnie, don't you know what your father has done?' say: 'Yes, sir; but the old gent is so high tem-pered I could do nothing with him. I tried to get his re-volver, but could not,' or words to that effect? A. Yes, sir."

Three objections are urged against the admission of this testimony: (1) That it was an attempt by the state to im-peach its own witness; (2) that the attempted impeachment was by contradicting the testimony of the witness as to mat-ters not relevant to the issue; (3) that it was also used as a means of placing before the jury incompetent testimony, highly prejudicial to the defendant.

All of these objections are valid. There is nothing dis-closed by the record indicating that the prosecution had been surprised or misled with reference to what the testimony of

John Keefe would be.  There is no proposition with reference to the introduction of testimony better established than

1. Witness—impeachment.  that a party cannot impeach the general character of his own witness.  By offering him as a witness, he asserts that he is worthy of belief.  (1 Greenl. Ev., § 442.)  In *Johnson v. Leggett*, 29 Kas. 591, it was said in the syllabus:

"The general rule is, that a party may not impeach his own witness; and while the court may sometimes, when it appears that a party is surprised by the testimony of a witness he has called, permit him to show what testimony he expected from the witness, and what reason he had for such expectations, and thus either directly impeach the witness or counteract any injurious effect which such unexpected testimony may have with the jury, yet this is a privilege which should seldom be exercised — only in extraordinary cases, and when it appears that material injury will otherwise result to the party."

There was no attempt made in this case to make any showing such as indicated by the rule declared in the case last cited.  It is generally said in the authorities that the contradiction of the testimony of a witness is rather for the purpose of relieving the party from the effects of unexpected statements from the mouth of the witness than for the purpose of impeaching his veracity in general; that a party may contradict one of his own witnesses as to a particular statement of fact, which ought not to conclude his rights, but that he may not produce a witness and then attack his character for truthfulness if he fails to testify in accordance with his interests.  (*The State v. Sorter*, 52 Kas. 531.)  But the attempted impeachment was by contradicting the statements of the witness concerning matters on which he had no right to testify.  Only competent statements relevant to the issue being tried can be contradicted for the purpose of impeachment.  (*Railroad Co. v. Townsend*, 39 Kas. 115; *The State v. Ray*, ante, p. 160.

The evidence as to declarations made by Johnnie Keefe, in the absence of his father, out of his sight and hearing, was

clearly inadmissible.   Nothing can be plainer, or better established in the law of evidence, than that one man shall not be bound by mere declarations of another, in his absence, and with which he is in no manner connected, and has in no manner assented to.   No one would contend, for an instant, that it would be competent to prove that any other person standing in Mustoe's store at the time of the shot said that the defendant had shot George Astley.   But, in this case, after Johnnie Keefe had denied making the statement, a witness was called to prove that he did make it, and the testimony of this witness was used ostensibly for the purpose of impeaching Johnnie Keefe, one of the plaintiff's own witnesses, but mainly for the purpose of showing the defendant's guilt.   The inference was sought to be drawn from this statement that Johnnie Keefe knew his father was armed when he met George Astley; knew that he intended to force him to return his money, and to kill him if he did not do so.   As showing the use, in fact, made of this testimony, a portion of the argument of counsel for the state is incorporated in the record, from which it appears that the prosecuting attorney in his argument said:

*Margin note:* 2. Prosecution for murder— declarations of defendant's son.

"Did Johnnie Keefe know of this intention that was in the old man's mind?   Did he know of the preparation the old man had made to meet Astley?   Gentlemen of the jury, I ask you that solemn question, and I want you to consider it well.   Johnnie Keeefe meets them, and then goes out.   He meets George Astley with his father, and then goes on from that depot; walks up to Furrow's store and sits down.   He can remember the meeting, remember the conversation was pleasant, remember his trip in the street, and the fact that he sat down there, but he cannot remember the exclamation that was made, that 'Pa has shot George Astley.'   Gentlemen of the jury, do you not doubt that proposition?"

Similar use was also made of the statement testified to by Evans, both by the county attorney and by Mr. Wallace, who also assisted in the prosecution.   It might be, under some circumstances, that this testimony would be of comparatively little importance; but in this case it was regarded by

the state as of very great importance.   It was in fact relied
on as of the utmost importance in showing the purposes of
the defendant.   There were no eyewitnesses to the tragedy,
and the only statement testified to by any witness tending to
show a purpose in the mind of the defendant to take life is
that of Frank Hardesty, that just as he stepped out of the
depot he said "no man could beat him out of his money and
live."   Other witnesses who were in the depot at the same
time stated that they did not hear any such expression from
the defendant.   The killing being admitted by the defend-
ant, the real issue in the case was as to whether
it was purposely and maliciously done, or whether
the circumstances were such as to render the de-
fendant's act either justifiable or constituting an
offense of inferior degree.   To use these declarations of his
son for the purpose of showing his purpose and intent was
highly prejudicial; sufficiently so, in our opinion, to require
a reversal of the judgment.

3. Unauthorized
declarations—
incompetent
evidence.

The defendant offered to show that the deceased had the
reputation of being a violent and dangerous man, but the
court excluded the evidence.   In view of all of the facts de-
veloped on the trial, and especially of the statements of the
defendant with reference to his acquaintance with Astley, and
that he had never had occasion to fear him, we do not regard
the exclusion of this testimony as reversible error. (*Wise v.
The State*, 2 Kas. 419; *The State v. Riddle*, 20 id. 711.)   If,
however, on another trial, the evidence fairly raises a doubt
as to whether the defendant acted in self-defense, we think
the general character of the deceased for ferocity and brutality
may be shown.   The general rule on this subject is thus stated
in Wharton's Criminal Evidence, § 84:

"Taking the authorities as a whole, therefore, we may hold
that it is admissible for the defendant, having first established
that he was assailed by the deceased and in ap-
parent danger, to prove that the deceased was a
person of ferocity, brutality, vindictiveness, and
of excessive strength; such evidence being offered
for the purpose of showing, either (1) that the defendant was

4. Self-defense—
character of
deceased.

acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or (2) that he was in such apparent extremity as to make out a case of self-defense; or (3) that the deceased's purpose in encountering the defendant was deadly. Of course, it is admissible for the defendant, in order to excuse a violent repulsion of an assault, to prove that he was so overmatched in strength that he had, when attacked, no other means of escaping from death or great bodily harm; but such evidence can never be received for the purpose of justifying an attack by the defendant on the deceased."

These propositions appear to us sound, and in accordance with the current of recent authorities. (*The State v. Bryant,* 55 Mo. 78; *The State v. Morey,* 36 Pac. Rep. 573.)

The following portion of the twenty-third instruction is subject to criticism: "Under the circumstances surrounding the killing of the deceased, as detailed by the defendant before you, the law required him to use the same care, effort and precaution to spare and save the life of the deceased as would have been exercised by an ordinarily prudent man under like circumstances." The law on this subject has been settled by this court in numerous decisions, which should be followed in charging the jury as to the defendant's right to take life in self-defense. (*The State v. Horne,* 9 Kas. 120; *The State v. Howard,* 14 id. 174; *The State v. Bohan,* 19 id. 55.)

5. Cases followed.

Complaint is also made of the twenty-fourth instruction, which reads as follows:

"The defendant in this case has introduced evidence of his good character as a peaceable and law-abiding citizen, and the character of the evidence adduced passes upon him a very high encomium, and should find much favor with the jury, unless they regard the crime as charged in the information as proven to their satisfaction beyond a reasonable doubt; then the good character furnishes no defense, and can be of no avail to the defendant. The evidence of good character should be considered by the jury in connection with all the other evidence in the case, and given that weight and credit which to you may seem proper and reasonable; but in weighing such evidence, you should also remember that all men, at

some time in their lives, have been of good character, and that men of previous good character have been known to commit some of the gravest crimes known to the law."

Good character is competent evidence in behalf of a defendant on the trial of a case of this kind. It is to be considered by the jury in determining the guilt or innocence of the accused, and weighed like any other fact. To say that such evidence must be cast aside, if from the other evidence alone the jury are convinced of the guilt of the defendant, is in effect a direction to disregard such testimony entirely, for all that a defendant in a criminal case ever needs is evidence sufficient to raise a reasonable doubt as to his guilt. In determining whether there is or is not reasonable doubt as to his guilt, the jury must place his previous good character, if shown by the testimony, in the scale, and weigh this along with all other facts and circumstances. The court should not attempt to separate out testimony as to good character, and in effect instruct the jury that they are to consider such testimony in case the defendant does not need it, and to reject it if he does.

6. Good character of defendant—questions for jury.

The prelude to the instructions is also complained of. As remarked in the case of *The State v. Wells*, ante, p. 161, it is generally better to omit extended remarks as to the duty of jurors in enforcing the laws, and discussions as to the effect on public morals of the enforcement or nonenforcement of the law; but we are not prepared to say that any reversible error was committed by the court in this case in that respect. The judgment is reversed, and a new trial ordered.

All the Justices concurring.