## No. 9031.

### GRAFF v. THE PEOPLE.

1. NEW TRIAL—*Newly Discovered Evidence—Diligence.* One convicted of crime, and applying for a new trial on the ground of newly discovered evidence, is not to be deemed negligent in not seeking for the evidence newly discovered from a witness who testifies upon his trial, and who was manifestly intent to clear herself of the same accusation, where the effect of the new evidence is to charge the witness.

2. EVIDENCE—*Party Discrediting His Own Witness.* A witness called by the District Attorney in rebuttal to impeach or discredit the accused declines to do so. The District Attorney, though surprised by this refusal, is not to examine the witness as to the irrelevant matters tending to besmirch or discredit her.

*Error to Denver District Court, Hon. W. D. Wright, Judge.*

Mr. O. N. HILTON, Mr. PHILIP HORNBEIN, Mr. CAESAR A. ROBERTS, Mr. LESLIE M. ROBERTS, for plaintiff in error.

Hon. LESLIE E. HUBBARD, attorney general; Mr. CHARLES ROACH, assistant attorney general, for The People.

Chief Justice Hill delivered the opinion of the court:

THE plaintiff in error, a licensed physician, hereafter called the defendant, was convicted of procuring the miscarriage of one Mrs. Ruth Kamp, which it is claimed caused her death. He was sentenced to the penitentiary for from eleven to thirteen years, and brings the case here for review upon error.

In his motion for a new trial, the defendant, among other things, alleges newly discovered evidence. To sustain this claim, he presented the affidavit of Mrs. Kate Dunn to the effect that she was and had been, since 1898, a trained nurse, residing in Denver about fifteen years; that from about the middle of January, 1916, until after the 20th, following, she had occasion to call on a Mrs. Lewis at her rooms, known as No. 5, 827 Sixteenth Street, Denver; that as nearly as she could fix the date, on January 19th, 1916, a young woman came to said rooms to see the woman, who had inserted an advertisement relative to women's diseases; that Mrs. Lewis was then absent; that while waiting the young woman confided to affiant that she was in a family way; that she had taken drugs, at least $20.00 worth, and got no relief and was told by parties that nothing but a surgical operation could relieve her; that affiant told her it was dangerous, and that she being young and strong, ought to go through to pregnancy; that she replied she would rather die than have the child; that she was going to get rid of it; that she asked affiant if she would nurse her; that affiant said "No"; that the young woman was about five feet three inches in height, weighed from one hundred thirty to one hundred thirty-five pounds, was light complexioned, brown eyes, brown hair, rather inclined to be fair, and in her manner was set and determined; that no

reasoning of affiant could move her from her determination to see some person who could relieve her, as she called it; that on the next day, or as affiant believes, on the 20th of January, 1916, in the afternoon, and between two and four o'clock, the same woman called again, and came into Mrs. Lewis' rooms and told her troubles, when affiant then stepped out into the waiting room, and Mrs. Lewis closed the door and continued to talk with the woman some minutes; that later Mrs. Lewis came out of the room where she was talking with the young woman, and went to a closet leading off from the room where affiant was sitting, and procured a speculum, a probe, and a pair of forceps, and put them in a bag or satchel, and went back into the room where the young woman was; that she was absent in the room with the young woman about forty to fifty minutes; that when Mrs. Lewis came into the room where affiant was, she said to affiant, "I have an A B case and I want you to nurse her," to which affiant replied, "I can not do that"; that then Mrs. Lewis stepped out of the room, and affiant heard her at the telephone, and heard her try to get several persons, but did not distinguish the names; that about an hour later, or about 5 p. m., Dr. Bennett Graff called at the rooms; that affiant remembered him from the fact that about ten years prior affiant had nursed a case under him, a surgical case involving a fractured arm; that Dr. Graff went into the room where the young woman was, and about fifteen minutes later he came out with the young woman, who was very pale, weak, and seemed distressed, and Dr. Graff took the young woman away with him; that affiant paid no further attention to the matter until afterwards, when, on reading the paper, affiant saw that Dr. Graff had been convicted of abortion upon Ruth Kamp; that it was stated that Dr. Graff had come to the rooms of Mrs. Lewis to get the girl, and the affiant recalled the circumstances and saw the attorneys for Dr. Graff on July 4th, 1916, communicating the facts to them; that affiant further recalls that no one was in the room while Mrs.

Lewis was with the young woman, and that affiant only remained in the sitting room because she expected to get back into Mrs. Lewis' room where the electric battery was, which affiant was using and had been using for several days to get relief from a tumor with which affiant is troubled; that after Dr. Graff left with the young woman, affiant went back into Mrs. Lewis' room, and finished her treatment with the battery. Affiant further says that the expression, "An A B case," is used and means an abortion case, and that when Mrs. Lewis said to affiant that she had "An A B case" for affiant to nurse, affiant knew that it was a case of abortion, and therefore refused the same.

There is testimony to the effect that Mrs. Kamp, the young woman in question, was at Mrs. Lewis', as stated in this affidavit, and that the defendant was phoned to come there by Mrs. Lewis; that he came and, after consultation with the young woman, took her away; that Dr. Brown, a witness for the people, had, a short time prior thereto, examined her; that he found she was about four and one-half months pregnant. The defendant testified that the deceased told him that she was married; that she was in a family way; that she had taken numerous drugs, and done many other things to bring on a miscarriage; that she had consulted two doctors, a Dr. Brown, and one other whose name she did not care to divulge; that upon being called, he told her that her condition was serious, advised that her husband be sent for at once (which it is agreed was done), and that he administered to her the necessary treatments to ward off the effects of her acts and that of others, if such had been committed, and if possible to prevent a miscarriage; that regardless of all that he could do, her condition became worse, and the premature birth commenced to come on, when, in order to save her life, it became necessary to assist it. There is testimony of several other physicians that if the conditions were as the defendant testified, that his treatment was proper throughout. In such circumstances, the testimony of the nurse to the facts stated in

her affidavit were important and material in aid of defendant's contention that previous attempts had been made to procure a miscarriage before he was called to attend the case. The fact alone, if it be true, that Mrs. Dunn saw the deceased twice in the rooms of Mrs. Lewis, which was shown to be several blocks distance from the defendant's office, coupled with the fact of Mrs. Lewis taking instruments used in such cases into the room where the deceased was at the time, and remaining there alone with her for some time, and immediately afterwards telling the affiant the kind of a case it was, all tend to sustain the defendant's contention that an abortion had been attempted before he was called. This was new and a different line of testimony on that subject, and all of which, outside of the statements of the deceased, was not cumulative testimony of any fact that had been testified to at the trial. For these reasons it was proper to be considered on the sufficiency of the motion for a new trial. *Garcia v. The People,* 59 Colo. 434, 149 Pac. 614; Vol. 2, Thompson on Trials (2nd ed.), Sec. 2762.

The Attorney General does not dispute the correctness of the position above outlined, but contends that it ought not be considered, for the reason that there is no showing on the part of the defendant that he used reasonable diligence to procure this testimony prior to the trial. In this we can not agree. In his motion for a new trial, the defendant alleges that this evidence could not, by any reasonable diligence, have been discovered at the time of trial. The record is to the effect that he did not know of these facts until after the trial, and nothing is pointed out by the Attorney General to show how he could have known them by the exercise of more diligence than displayed by him until after Mrs. Dunn, learning of his conviction through the newspapers, advised his attorneys of her knowledge concerning them. This appears to have been his first knowledge of her knowing anything about them. *Mitchell v. The People,* 53 Colo. 479, relied upon by the Attorney General, is not applicable to the facts here. In that case a jury had

disagreed upon a first trial at the April term. Upon a second trial in November, following, the defendant was convicted of the larceny of a steer. Her defense was that the steer bore her brand, and not that of the prosecutor. Her affidavit in support of newly discovered evidence stated that "she now recalls" meeting upon the road, when driving the animal in question, a man whom she did not recognize, but had recently discovered that his name was Beals, etc. In that case the court pointed out that there was no showing of any effort made, before conviction upon the second trial, to discover this witness, and that defendant gave no reason for her failure to recall at an earlier date her meeting with him, etc. In the case at bar, the testimony of Mrs. Lewis discloses an evident intent to clear herself of the transaction. In such circumstances, the defendant could not be charged with lack of diligence in not getting from her information tending to connect her with the commission of this crime or disclosing the identity of others who might furnish testimony showing this fact. Under such conditions, in the absence of testimony to the contrary, it is proper to assume that she would naturally withhold all such information. There is nothing to show that the defendant knew that Mrs. Dunn had any more knowledge on the subject than any other nurse in the city of Denver.

When the record is considered as a whole, we are of opinion that it was prejudicial error to overrule the motion for a new trial on the showing made. This necessitates a reversal of the case.

In view of a new trial, one other error should be considered. The defendant, who it is agreed was a licensed physician, testified that he first met the deceased at the rooms of Mrs. Lewis, who called him over the phone, requesting that he come. Mrs. Lewis was called by the people in rebuttal for the purpose of impeaching the defendant on this question, but when asked concerning it, admitted that she had phoned the defendant as testified by him. Upon his claim of being surprised at the answer and statement,

that he had reason to believe it would be otherwise, the District Attorney was allowed to ask her if a Mr. Young from their office, and Mr. Kamp, the husband of the deceased, had not been at her place the night before. This she admitted. She was then asked, "Q. And did you not there say that you did not phone to Dr. Graff?" Upon objection to this question and argument following, it was not answered and no ruling was made concerning it. That portion of sundry objections made as to cross-examination of the witness upon account of being the people's witness was overruled, but over further objections the District Attorney was allowed to examine the witness pertaining to sundry newspaper advertisements, and compelled her to admit, although reluctantly, that they had been inserted by her. The only doctor mentioned by the witness in connection with these advertisements or her office, to which they referred, was a Dr. Morrison. These newspaper advertisements were such, in our opinion, as would tend to convince any intelligent juror that the witness was engaged in questionable transactions at least, probably in the practice of soliciting abortion cases, possibly in committing them. There was no showing that the defendant was in any way connected with or had anything to do with them, or with the witness, or her offices, other than that he had been called by her the one time as testified to by him. In such circumstances, this so-called testimony was not only improper, but highly prejudicial to the rights of the defendant. When coupled with the fact that the defendant was called by her, it might have caused the jury to give it force as competent testimony tending to establish his guilt. To allow it to stand would be to hold in other cases, for instance where one is charged with the theft of a horse, and gives certain testimony that the people could call a witness in rebuttal to impeach him, and if the witness did not do so, the people could then say, Very well, but for this reason we now propose to show by documentary testimony that in fact you are a horse thief. Such a practice has never been permitted

by this court. In *Moffat v. Tenney,* 17 Colo. 189, the rule, in substance, is laid down that where a party calls a witness he thus, in contemplation of law, recommends him as worthy of credit and can not call other witnesses to directly impeach his general character for truth and veracity, but he is not absolutely bound by his testimony if he can show the contrary to be the truth by other competent evidence.

In *Babcock v. The People,* 13 Colo. 515, 22 Pac. 817, this question is gone into quite fully, wherein, after suggesting sundry conditions in which it might arise, at page 520, the court says:

"Under such circumstances, where a party is really taken by surprise at the conduct of his own witness, it is in the discretion, and is often the duty, of the trial court to allow a party to put leading questions to his own witness, as the only means of preventing an unwilling witness from concealing the truth by unsatisfactory or evasive answers; and in extreme cases, where it is apparent that a witness is giving testimony contrary to the reasonable expectation of the party calling him, such party should be allowed to cross-examine such witness, for the purpose of refreshing his recollection, with the view of modifying his testimony, or of revealing his real *animus* in the case. But while a party should, when the occasion clearly justifies it, be permitted to interrogate by leading questions or cross-examine his own witness, and to ask him if he has not theretofore made other or different statements from those he has just given in evidence, still sound discretion must be exercised, lest the privilege be abused. *Neither upon reason nor authority can a party be allowed to impeach his own witness by showing that his general reputation for truth and veracity is bad in the community where he is known;* nor can a party, according to some authorities, be allowed to introduce other witnesses to show that his own witness, at another time, has made other or different statements from those he has given in evidence on the trial."

As to this latter declaration, the courts are not in harmony concerning. It is not involved in this record, however, for the reason that neither Mr. Young nor Mr. Kamp were asked concerning what Mrs. Lewis said to them on this subject, but in any event we find no case which approves the doctrine where a witness has been called in rebuttal to impeach the defendant, and declines to do so, even though the answer may be a surprise to the District Attorney; that for this reason he can, through the witness, present irrelevant facts to the issue, which tend to impeach, discredit or besmirch the character of the witness as was permitted in this case. Authorities from other jurisdictions sustaining our line of reasoning and some of which go further are: *State of Kansas v. Keefe,* 54 Kans. 197, 38 Pac. 302; *Hull v. State ex rel. Dickey,* 93 Ind. 128; *Mercer et al. v. State, etc.,* 41 Fla. 279, 26 So. 317; *People v. Jacobs,* 49 Calif. 384.

The judgment is reversed.

Reversed.

Mr. Justice Allen and Mr. Justice Bailey concur.