No. 22,970.

HAZEL M. GUFFEY, *Appellant,* v. THE CONTINENTAL CASUALTY COMPANY, *Appellee.*

### SYLLABUS BY THE COURT.

1. LIFE INSURANCE—*Death While Resisting an Attempt to Take Suitcase —No Intent to Rob Deceased Shown.* The plaintiff, to establish her claim that the deceased was killed by an assault upon him for the sole purpose of robbery, put upon the stand the only eyewitness to the tragedy, the man who killed him. His story was that he, a special agent for the railroad company, without a warrant attempted to get possession of a suitcase carried by the deceased which he thought contained intoxicating liquor and which he afterwards found did contain such liquor; that after striking the deceased over the head with a rubber club in order to get the suitcase, the deceased choked him until he was compelled to shoot in self-defense. *Held,* that from this testimony no proof or inference could be derived that the assailant had any intent to rob the deceased, and hence a demurrer to the plaintiff's evidence was properly sustained.

2. SAME—*Larceny Included in Robbery.* Robbery includes larceny and may be deemed forcible larceny, and in order to constitute it there must be an intent to deprive the owner of the property taken, not temporarily, but permanently.

Appeal from Dickinson district court; ROSWELL L. KING, judge. Opinion filed May 7, 1921. Affirmed.

*G. W. Hurd, Arthur Hurd,* and *Bruce C. Hurd,* all of Abilene, for the appellant.

*C. S. Crawford,* and *E. S. Crawford,* both of Abilene, and *George R. Sanderson,* of Chicago, Ill., for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff brought this action to recover on an insurance policy for the death of her husband. Charles Walter Howard, a Rock Island special officer, boarded an incoming Rock Island passenger train as it approached Herington. The deceased lived at Herington at a place directly west of where such trains stopped for a Missouri Pacific crossing, and on the evening in question when this train stopped there the deceased picked up his suitcase and started to alight, when he was accosted by Howard who followed him and demanded the suitcase, which Guffey refused to give him. Guffey's father testified that his son was a boiler maker for the Rock Island and lived due west of the crossing and the roundhouse; that in going from his house to his work he crossed to the roundhouse from where he lived; that on the day of the tragedy he had been to Kansas City; and that the train was due between eleven and twelve o'clock. The plaintiff testified that her husband had been working for the Rock Island for about eleven years, and lived about two and one-half blocks due west from the shops; that there was a path which he usually walked in; that the vestibules were always open when the trains reached the crossing. Howard, himself, testified that on the evening in question when Guffey started to get off the train he told him they were not yet at the depot. He followed him—

"To get the suitcase, or see what was in the suitcase was what I was after. . . . Well, I told him to stop, I wanted his suitcase, and he said no, and I told him I was an officer, and he was under arrest. He kept on running, and I kept up with him and struck him on the head with a rubber club. He then whirled and grabbed me. I got away, and seeing that I could not take him I started back away myself, and he grabbed me the second time and commenced choking me. I then reached for my gun seeing that I could not do anything else as he had me fainting then, and giving away, and in fear of my own life I put my gun against his stomach and poked him with it thinking perhaps that he would realize what it was and turn me loose. But instead he kept on choking me. I then pulled the trigger.

"Q. On the 16th day of March, 1918, what if any Federal, state, county, or city office did you hold?  A. Rock Island special officer.

"Q. What office, if any besides Rock Island special officer, did you hold at that time?  A. None.

"Q. Did you have any warrant for the arrest of John Guffey?  A. No, sir.

"Q. Did you know John Guffey at the time you saw him on the train about to get off?  A. No, sir.

"Q. Did you know where he lived or where he worked?  A. No, sir.

"Q. I wish you would state just all that you said, and all that he said at the time he was attempting to get off the train as you have stated.  A. Well, when I first got on the train to ride down to the eating house, he was about to get off, and I told him that was not the station, and he said he wanted to get off at the crossing.  And I said Oh and got back out of his way, and he picked up the suitcase, and I seen it was heavy, and being trained by other officers how to tell booze, I asked him to let me see the suitcase, and he said no, and started to run.  I then took after him telling him I was an officer, and he was under arrest. . . .

"Q. You have stated that you were a special officer of the Rock Island Railroad Company.  I wish you would state what your duties were as such officer.  A. To guard company property.  Mr. Douglas the day special officer at that time told me that he was instructed by the chief of special service to instruct me and to watch all company property, and to watch the bootleggers—people bringing in booze."

The policy sued on provided among other things that—

"This policy does not cover any loss  . . .  if the injury causing it results from the intentional act of the insured, or any other persons, excepting however assaults committed upon the insured for the sole purpose of burglary or robbery."

The court sustained a demurrer to the plaintiff's evidence, and from this ruling the appeal is taken.

The special agent testified that after the shot he went to the yard office with the suitcase and called a doctor, and told the yard crew to get a switch engine and take the wounded man to the station.  "I then called up the city police and gave myself up."  On cross-examination he testified:

"I was after the booze, yes, but the watch and money I knew nothing whatever about.

"Q. And what was your purpose in getting the booze, or attempting to get it?  A. I was told to watch for people with booze, or bootleggers by the man left to instruct me, and was acting according to instructions."

He also testified that at the time of the shot he was unable to speak, and acted in self-defense, and acted as he did because he considered himself in great danger.

The father testified that the deceased had a bruise on his forehead, a large bruise, and the top of his head had been struck, and the blood was working out of his ears. Over the objection of the plaintiff the special agent was allowed to testify that he afterwards learned that the suitcase contained "whisky—that is booze, different kinds of drink, all liquor."

It is argued by the plaintiff that the assault showed the elements of taking property by force from the person of the deceased, putting him in fear, acting against his will, overcoming peaceable possession; that it was not the property of the taker; that he was not an officer and did not have a warrant for the arrest of the deceased. On the other hand it is argued that the killing was brought about by the deceased himself who assaulted the special agent after he had retired from his first attack; that he walked some ten steps back to him. It is urged that there was no intent to rob and no felonious intent on Howard's part because—

"The officer certainly thought he had a right to take this contraband liquor. He wanted to turn it over to the authorities. That he had or had not the legal right to arrest the man having it in his possession is beside the question. He thought he had and so did Guffey. The entire case vindicates the good faith of Howard in seeking to take this liquor into his possession. His intent was to get the liquor and turn it over to the authorities. He had no intention feloniously to take or deprive Guffey of his possession. The entire testimony in the case negatives conclusively any felonious intent."

The plaintiff was compelled to put Howard on the stand as there was no other eyewitness to the tragedy, but of course, being her witness his testimony cannot be considered as that of an adverse witness. Had he been called by the defense it would doubtless have been a question for the jury whether his version of the affair was the true one or one made in view of his own interest and possible danger of criminal prosecution. But, while a party is not always and to all intents bound by all that his witness may say on the stand, usually he is not permitted to impeach him, and so this evidence as to Howard's intent must be viewed as credible. (*The State v. Keefe,* 54 Kan. 197, 201, 38 Pac. 302; *Johnston v. Marriage,* 74 Kan. 208, 86 Pac. 416, 87 Pac. 74; Note, 21 L. R. A. 418.)

Robbery is larceny committed by violence to the person of one put in fear. (*The State v. Segermond,* 40 Kan. 107, 19 Pac. 370.) The statute provides:

"Every person who shall be convicted of feloniously taking the property of another from his person or in his presence, and against his will, by violence to his person or by putting him in fear of some immediate injury to his person, shall be adjudged guilty of robbery in the first degree." (Gen. Stat. 1915, § 3443.)

Three ingredients are essential: The use of force and violence, the taking from a person of another money or other personal property, and an intent to rob or steal. (*Matthews v. The State,* 4 Ohio St. 539; 7 Words and Phrases, 6258.) It has been held that robbery embraces the same elements as simple larceny. (*Houston v. Commonwealth,* 87 Va. 257.) Our statute defines larceny as the felonious stealing, taking or carrying away of personal property. (Laws of 1920, ch. 38; Gen. Stat. 1915, § 3450.) "Felonious" means that felonious intent which has been defined as an intent to deprive the owner not only temporarily but permanently of his property, without color of right or excuse for the act, and to convert it to the taker's use without the consent of the owner. (*In re Mutchler, Petitioner,* 55 Kan. 164, 40 Pac. 283; *The State v. Shepherd,* 63 Kan. 545, 66 Pac. 236; 52 L. R. A., n. s., 1014, note.)

"In robbery, as in larceny, it is essential that the taking of the goods be *animo furandi,* and unless the taking be with a felonious intent it is not robbery." (23 R. C. L. 1149.)

Of course, there can be no robbery under the statute without an intent permanently to deprive the owner of the property and to convert it to the taker's use, and there is no construction which can reasonably be put upon Howard's testimony which would support the theory that he intended thus to take any of Guffey's property and appropriate it to his own use.

It is quite plain that, clothed with a little brief authority which he greatly exaggerated, he intended to take the liquor which he thought was in Guffey's suitcase and use it for the purpose of prosecuting him. Tragic and needless as the killing was, it would be a distortion of testimony and a wresting of language to conclude that Howard acted with intent to rob Guffey.

We conclude, therefore, and hold that the demurrer to the plaintiff's evidence was rightly sustained, and that ruling is affirmed.