725 P.2d 801

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Danny Lee OLIN, Defendant-Appellant.**

**No. 15753.**

Court of Appeals of Idaho.

Sept. 5, 1986.

Gregory C. Pittenger, Killen & Pittenger, McCall, for defendant-appellant.

Jim Jones, Atty. Gen. by Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BURNETT, Judge.

Danny Lee Olin stands convicted by a jury of robbing a convenience store and of displaying a firearm while committing the crime. On appeal Olin presents three issues: (1) Does the evidence support the jury's determination that Olin displayed a "firearm" as defined by the applicable statute? (2) Does Idaho's robbery statute embody a common law element of specific intent permanently to deprive an owner of his property? (3) If the statute does contain such an element, should the trial judge's refusal to so instruct the jury be treated as harmless error? For reasons explained below, the judgment of conviction is affirmed by a majority of this Court.

I

At times pertinent here, I.C. § 19–2520 provided that a defendant convicted of an enumerated crime, such as robbery, would receive an "additional" sentence if the crime was committed while carrying, displaying, using, threatening to use, or attempting to use a firearm. The statute defined "firearm" as "any deadly weapon

capable of ejecting or propelling one or more [projectiles] by the action of any explosive or combustible propellant, and includes unloaded firearms and firearms which are inoperable but can readily be rendered operable." In this case Olin has contended that the evidence was insufficient to show that the object he displayed was a "firearm," operable or readily rendered operable, as denoted by the statute. We disagree.

Olin was arrested shortly after a robbery had been reported at the convenience store. A .44 magnum Smith & Wesson pistol, loaded with hollow-point bullets, was found in his vehicle. The pistol later was admitted in evidence at trial. A store clerk identified Olin as the robber and testified that he had pointed a gun toward her. She said the pistol in evidence "look[ed] like" the gun Olin had displayed. She further stated that Olin cocked the gun and threatened to "blow [her] head off" if she did not give him the money in a cash drawer. A police officer examined the pistol in evidence and testified that it appeared to be operable.

We have held that a jury may infer from circumstantial evidence that a weapon displayed during commission of a crime was a "firearm" within the meaning of I.C. § 19–2520. *State v. Metzgar,* 109 Idaho 732, 710 P.2d 642 (Ct.App.1985); *State v. Stedtfeld,* 108 Idaho 695, 701 P.2d 315 (Ct.App.1985). In this case we conclude that the circumstances were more than adequate to support an inference that Olin displayed a "firearm" during the incident at the convenience store.

The remaining issues on appeal concern the substantive charge of robbery. These issues have produced divergent views among members of our Court. In Parts II and III of this opinion, the author expounds the view that the trial judge failed to instruct the jury on a necessary element of robbery and that such error should not be deemed harmless. Chief Judge Walters, writing separately, states his belief that the jury was correctly instructed. Judge Swanstrom, also writing separately, takes the position that the jury instructions may have been deficient but that the error was harmless. Because Chief Judge Walters and Judge Swanstrom would uphold the jury's verdict, albeit for different reasons, their votes govern the outcome of this appeal. Accordingly, the judgment of conviction must be, and hereby is, affirmed. We now turn to the issues that have divided the Court.

## II

### A

The elements of robbery are deeply rooted in legal history. At common law, robbery was regarded as an "aggravated larceny." [1] 2 W. LaFAVE & A. SCOTT, SUBSTANTIVE CRIMINAL LAW § 8.11, at 437 (1986) (hereinafter cited as LaFAVE & SCOTT). Robbery consisted of all elements of larceny plus two additional requirements: that the property be taken from the person or presence of another, and that the taking be accomplished by means of force or fear. 4 C. TORCIA, WHARTON'S CRIMINAL LAW § 469, at 39–40 (14th ed. 1980) (hereinafter cited as WHARTON).

Larceny, in turn, was defined at common law as the trespassory taking and carrying away, with felonious intent, of personal property belonging to another. 4 BLACKSTONE, COMMENTARIES 230 (hereinafter cited as BLACKSTONE). *See also* CLARK & MARSHALL, A TREATISE ON THE LAW OF CRIMES § 12.00, at 798 (1967) (hereinafter cited as CLARK &

1. In ancient law, before development of a cohesive body of common law, robbery and larceny were treated as separate offenses. "The primitive view was that the robber, who acted in the open, was not quite so low in the antisocial scale as the thief, who committed his depredation secretly [footnote omitted]." R. PERKINS & R. BOYCE, CRIMINAL LAW 344 (3d ed. 1982) (hereinafter cited as PERKINS & BOYCE). However, as societal aversion to robbery grew, and as robbery came to be recognized as a crime against both person and property, it evolved into a form of compound larceny—larceny plus circumstances of aggravation. *Id.* *See also* LaFAVE & SCOTT at 437 n. 1.

MARSHALL); 3 WHARTON § 354, at 298. Thus, larceny did not consist merely of a taking that was wrongful because of a trespass against the property rights of the victim; rather, larceny required that the taking also be accompanied by a "felonious" intent. J. BISHOP, CRIMINAL LAW § 840, at 638–39 (1923) (hereinafter cited as BISHOP). The word "felonious" in this context was a common law term of art particularly referring to an act done *animo furandi* —that is, with an intent to steal.[2] 4 BLACKSTONE 232; LaFAVE & SCOTT § 8.5, at 357.

The common law intent to steal was more than a general intent to take another's property, coupled with awareness that the taking was wrongful. The intent to steal was an additional, specific intent permanently to deprive the owner of his property.[3] Without this specific intent, a wrongful taking could be a trespass or a civil injury, but it could not be a common law larceny. 50 AM.JUR.2D *Larceny* § 36 (1970); WHARTON § 360, at 317. The point has been put concisely as follows:

> One may take the chattel of another by trespass and with full knowledge of his trespass and still not be guilty of [larceny]. . . .
>
> . . . Needless to say, the intentionally unprivileged use of another's property is unlawful and antisocial, but it takes more than this to constitute the serious crime of larceny.

PERKINS & BOYCE 326–27 (footnotes omitted).

In sum, the "felonious" intent embodied in common law larceny went beyond a general intent to take property wrongfully. It was a specific intent to deprive the owner permanently of his property. This element

of larceny came to the United States as part of our common law heritage and eventually was incorporated into Idaho's larceny statutes. From territorial days until the present decade, I.C. § 18-4601 and its predecessors defined larceny as the "felonious . . . taking . . . [of] the personal property of another." While these statutes were in effect, our Supreme Court repeatedly declared that a "felonious" taking required the specific intent permanently to deprive the owner of his property. *E.g., State v. Owens*, 101 Idaho 632, 619 P.2d 787 (1980); *State v. Jesser*, 95 Idaho 43, 501 P.2d 727 (1972); *State v. Hurst*, 36 Idaho 156, 209 P. 724 (1922); *State v. Riggs*, 8 Idaho 630, 70 P. 947 (1902).

The definitional nexus between a "felonious" taking and the specific intent permanently to deprive was recognized by our Legislature when it recodified larceny as "theft" in 1981. *See* I.C. §§ 18-2401 to -2410. When enacting the "theft" statutes, the Legislature dropped the reference to a "felonious" taking but simultaneously inserted an explicit requirement of intent to deprive. "Deprive" was given a special definition as withholding property "permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost. . . ." I.C. § 18-2402(3)(a). This language tracked prior court decisions interpreting permanent deprivation. *See* note 3, *supra.* Thus, the Legislature understood and perpetuated the historical meaning of a "felonious" taking in the common law.

As noted, common law robbery consisted of common law larceny plus aggravating circumstances. Consequently, it embodied all elements of larceny, including the spe-

---

**2.** Some early American courts interpreted Blackstone as suggesting that the *animus furandi* embraced a further element of *lucri causa* (a benefit to the thief). However, this view now stands repudiated by most courts and virtually all commentators. Larceny may be committed even if the thief promptly loses or destroys the property taken. *See generally* CLARK & MARSHALL § 12.04, at 830–31; LaFAVE & SCOTT § 8.5, at 357; WHARTON § 364, at 336–37.

**3.** The "owner" of property could be any person lawfully entitled to its possession. A "permanent" deprivation would be deemed to occur if the property were kept by the thief until a reward was paid or until the value of the property to the "owner" had been substantially lost. These dimensions of the *animo furandi* long have been settled in court decisions and more recently have been codified in many American larceny statutes. *See* PERKINS & BOYCE 327–28; 3 WHARTON § 360, at 320.

cific intent permanently to deprive an owner of his property.

> The felonious intent to steal, or animus furandi, is as necessary to constitute robbery as it is to constitute larceny. The robber must have a fraudulent intent *and* must intend to deprive the owner permanently of his property.

CLARK & MARSHALL § 12.10, at 883 (emphasis added). "The intent to steal ... required for larceny is the same intent to steal (or, as it is sometimes called, intent to rob) needed for robbery." LaFAVE & SCOTT § 8.11, at 440 (footnote omitted). Other authorities on the common law have reached the same conclusion. *See, e.g.,* BISHOP § 1162, at 862; PERKINS & BOYCE 343–45; 4 WHARTON § 469, at 39–46; 67 AM.JUR.2D *Robbery* § 17 (1985).[4]

American statutes embodying the common law of robbery typically have not spelled out each incorporated element of common law larceny. Rather,

> they define the crime of robbery in different ways, often in the somewhat undetailed language used by Blackstone, Hawkins, Hale and East in defining common-law robbery, e.g., "the *felonious* and violent taking of goods or money from the person of another by force or intimidation."

LaFAVE & SCOTT § 8.11, at 438 n. 6 (emphasis added). Idaho's robbery statute, I.C. § 18–6501, follows this pattern. Like our former larceny statute, the robbery statute dates back to the territorial era. It defines robbery as "the *felonious* taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Emphasis added.)

The phrase "felonious taking" imparts a common law meaning to the robbery statute that coincides with the meaning ascribed to the former larceny statute. Both statutes are subject to the general rule that common law terminology will be given its common law meaning, unless a contrary legislative intent appears. *E.g., Moser v. State,* 91 Nev. 809, 544 P.2d 424 (1975); *Rogers v. Donovan,* 268 Or. 24, 518 P.2d 1306 (1974). *See* LaFAVE & SCOTT § 2.2, at 110. This rule of construction has been articulated and applied to federal legislation by the United States Supreme Court:

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

*Morisette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952).

In other jurisdictions, cases construing robbery statutes illustrate this general

---

**4.** One commentator has advanced a contrary view. Professor M. Cherif Bassiouni, of the DePaul University College of Law, in Illinois, has stated:

> The crime of robbery is said to include the element of intent in the crime of larceny. However, it is to be distinguished in that it is the intent to steal and not the intent to permanently deprive which characterizes this crime. Thus, the taker may intend to take the property only temporarily, but this would still constitute robbery. The object of the crime is to prevent the use of force and threats against persons as a means of inducing them to part with their property.

M. BASSIOUNI, SUBSTANTIVE CRIMINAL LAW § 8.2, at 336 (1978). Professor Bassiouni cites no authority in support of this view. Insofar as he purports to describe the elements of common law robbery, Professor Bassiouni is flatly contradicted by the great weight of legal scholarship on the subject. His differentiation of robbery and larceny is more characteristic of the ancient, pre-common law. *See* note 1, *supra.* His view also may reflect statutory alterations of the common law in some states. For example, in Illinois, robbery is defined simply as "tak[ing] property from the person or presence of another by the use of force or by threatening the use of force." Ill.Ann.Stat. ch. 38, § 18–1. Such a statute contains no reference to the common law element of "felonious" intent. Accordingly, it does not require a taking to be accompanied by the specific intent permanently to deprive the owner of his property. *E.g., People v. Banks,* 75 Ill.2d 383, 27 Ill.Dec. 195, 388 N.E.2d 1244 (1979).

rule. *See generally* 67 AM.JUR.2D *Robbery* § 17, at 70 (hereinafter cited as AM. JUR.2D *Robbery* ). For example, in *People v. Ford*, 60 Cal.2d 772, 36 Cal.Rptr. 620, 388 P.2d 892 (Cal.1964), *cert. denied*, 377 U.S. 940, 84 S.Ct. 1342, 12 L.Ed.2d 303 (1964), a statute like Idaho's, referring to a "felonious" taking, was construed to require a specific intent permanently to deprive. Conversely, in *State v. Thompson*, 221 Kan. 165, 558 P.2d 1079, 1086 (1976), in *Litteral v. State*, 97 Nev. 503, 634 P.2d 1226, 1228 (1981), and in *Traxler v. State*, 96 Okl.Cr. 231, 251 P.2d 815, 835 (App. 1952), this common law requirement was rejected because the statutes in question, unlike Idaho's, did *not* refer to a "felonious" taking. As these cases demonstrate, state legislatures are free to adopt definitions of robbery that vary from the common law. Where the legislatures have chosen to do so, the larceny elements of common law robbery may be modified or eliminated. But in Idaho, the Legislature has seen fit to leave our common-law-based robbery statute unchanged.[5]

Idaho's inclusion of larceny in its robbery statute is further revealed by Supreme Court decisions recognizing that the statute is inapplicable to a defendant who reclaims his own property from another who has no superior right of possession. In *State v. Price*, 38 Idaho 149, 219 P. 1049 (1923), our Supreme Court overturned the robbery conviction of a defendant who threatened violence in order to recover money lost by gambling. The Court reasoned that gambling debts were illegal, that the winner was not lawfully in possession of the money and, therefore, that the defendant did not commit robbery in re-

claiming his own property by force. Dissenting, Chief Justice Budge accepted the Court's general characterization of the robbery statute but urged that when a gambling debt is voluntarily paid in accordance with the rules of the game, the winner "owns" the money and a forcible retaking of it constitutes robbery. Both the majority opinion and the dissent implicitly treated the robbery statute as embracing the elements of larceny.

The foundation of *Price* was laid in *State v. Brill*, 21 Idaho 269, 273, 121 P. 79, 81 (1912). There the Supreme Court stated, "The general rule is that a person cannot commit the crime of robbery by taking his own property, unless the person robbed has a special property right therein and the right to its possession." Specially concurring, Justice Ailshie noted that robbery under Idaho law is more than a mere taking of property by the use of force or fear:

> There is no doubt but that robbery includes the crime of larceny....
>
> ... I do not think a man could be held guilty of robbery under our statute for taking his own property from the person or the presence of another, where he is legally entitled to the immediate possession thereof. Of course, if he used force or indeed fear in procuring the possession of his own property, he would, perhaps, be guilty of some crime under our statute, but it would not be the crime of robbery.

*Id.* at 276–77, 121 P. at 81. The *Price* and *Brill* cases leave no doubt that Idaho follows the common law in treating robbery as a form of aggravated larceny.[6]

---

**5.** Chief Judge Walters' opinion suggests that a legislature's choice of statutory language, such as "felonious" taking, is fortuitous. It is respectfully submitted that this suggestion fails to take account of the deep historical significance of the language chosen, the parallel references to "felonious" taking in Idaho's robbery and larceny statutes, and the careful attention recently devoted to the subject by our Legislature when enacting the theft statutes.

**6.** Chief Judge Walters contends that our robbery statute proscribes the "means employed" in a taking without regard to whether the taking

constitutes a larceny. The authorities cited in support of this contention are *State v. Phillips*, 62 Idaho 656, 115 P.2d 418 (1941); *People v. Banks*, 75 Ill.2d 383, 27 Ill.Dec. 195, 388 N.E.2d 1244 (1979); and *Litteral v. State*, 97 Nev. 503, 634 P.2d 1226 (1981). *Phillips* is an extortion case, not a robbery case. At common law, the absence of larceny is what distinguishes extortion from robbery. PERKINS & BOYCE 345. *Banks* and *Litteral*, as noted elsewhere in this opinion, deal with robbery statutes that do *not* incorporate larceny by reference to a "felonious" taking. They are not helpful in construing

**B**

■ Where, as in Idaho, robbery embraces larceny, it requires a specific intent permanently to deprive the owner of his property. Consequently, one of the available defenses to the charge of robbery is that the defendant was so intoxicated he could not form the requisite specific intent.[7] *See* LaFAVE & SCOTT § 8.11, at 441 n. 21; 4 WHARTON § 470, at 45–46; 67 AM.JUR.2D *Robbery* § 46, at 96 (1985). In the present case, Olin testified that he had been intoxicated during the incident at the convenience store. He claimed that he had no intent to rob the store and that he did not know what he was doing there. His counsel requested the trial judge to instruct the jury that robbery requires the specific intent permanently to deprive an owner of his property. The judge refused, offering this explanation:

> I don't believe it is implicit in robbery that you have a larceny or theft involved. I think you can have a robbery, in other words, when the intent is maybe even giving the personal property back ... at some time. It's the taking by means of force and fear that constitutes the offense of robbery.

A jury must be instructed on the specific intent required for robbery. Indeed, the California Supreme Court, faced with a robbery statute identical to our own, has held that such an instruction must be given *sua sponte* even if the defendant does not request it. *E.g., People v. Ford, supra. See also* CALIFORNIA JURY INSTRUCTIONS: CRIMINAL § 9.10 (1982 Rev.) (itemizing the elements of robbery and expressly referring to a "specific intent permanently to deprive the person of the property"). In this case, as stated above, the requested instruction should have been given.

**1**

In defense of the trial court's refusal to instruct, the state asserts that the phrase "felonious taking" has a much narrower meaning than the common law ascribed to it. The state would have us hold that the phrase merely describes robbery as a "felony." The state urges the following cases in support of its position: *Thomas v. State,* 522 P.2d 528 (Alaska 1974), *overruled on other grounds; Evans v. State,* 550 P.2d 830 (Alaska 1976); *United States v. Pender,* 309 A.2d 492 (D.C.App.1973); *State v. Clingerman,* 213 Kan. 525, 516 P.2d 1022 (1973), *modified on other grounds; State v. Lucas,* 221 Kan. 88, 557 P.2d 1296 (Kan. 1976) (instruction on common law meaning of "felonious" must be requested to preserve error on appeal); *Eggleston v. State,* 4 Md.App. 124, 241 A.2d 433 (1968); *Petition of Brown,* 150 Mont. 483, 436 P.2d 693 (1968); *State v. Stephens,* 7 Wash.App. 569, 500 P.2d 1262 (1972), *rev'd in part on other grounds,* 83 Wash.2d 485, 519 P.2d 249 (1974); *State v. Schneider,* 60 Wis.2d 563, 211 N.W.2d 630 (1973). We have examined these cases, and we find no support for the state's argument in any of them.

*Thomas, Pender, Brown* and *Schneider* do not deal at all with the meaning of "felonious taking" in a robbery statute. Rather, they discuss the word "feloniously" as used in charging documents— i.e., indictments, informations and complaints. The charging documents in those cases alleged crimes relating to narcotics, false pretenses, manslaughter and obscenity, respectively. The cases tell us nothing about the meaning of "felonious taking" in a robbery statute. The court in *Pender* cautioned that the word "feloniously" may have various meanings and must be construed according to its context. 309 A.2d at 493. Moreover, the court in *Brown* rejected an argument that "feloniously" always describes a felony. The court held it

---

a statute like the one found in Idaho. Moreover, both cases rely heavily upon the view of Professor M. Cherif Bassiouni. His view is not authoritative on common law robbery or on the meaning of a robbery statute that incorporates common law elements. *See* note 4, *supra.*

7. Conversely, where robbery has been redefined by statute to exclude the common law elements of larceny, the crime is one of general intent and intoxication is no defense. *E.g., People v. Berlin,* 132 Ill.App.2d 697, 270 N.E.2d 461 (1971).

permissible to use the word in a misdemeanor complaint.[8] Taken together, these cases merely teach us that the adverb "feloniously" in a charging document is not to be confused with the use of the adjective "felonious" in the statutory phrase "felonious taking."

The standards that govern charging documents should not be confused with those relating to jury instructions. A charging document may describe an offense simply in the language of the statute allegedly violated. *See People v. Butler*, 1 Idaho 231 (1869) (holding that robbery indictment sufficiently charges intent to steal by using the statutory term "felonious"). However, as explained later in this opinion, the statutory language may not always suffice to explain the elements of the offense to a jury.

The *Stephens* and *Clingerman* cases cited by the state hit closer to the issue now before us but, when examined closely, they actually refute the state's position. *Stephens* dealt with convictions for burglary and robbery. The question as to the meaning of the word "feloniously" arose from the burglary statute and is of no importance here. However, when examining the robbery conviction, the *Stephens* court said that "[a]n intent to steal is a necessary element of the crime...." 500 P.2d at 1265. As explained earlier, "intent to steal" is the English common law term for *animus furandi*. It embraces the specific intent permanently to deprive an owner of his property. The *Clingerman* decision further develops this point. The Kansas Supreme Court, quoting from *Guffey v. Casualty Co.*, 109 Kan. 61, 197 P. 1098, 1099 (1921), said the following about a Kansas robbery statute which closely resembled the Idaho statute:[9]

[The statute provides that every] person who shall be convicted of feloniously taking the property of another from his person or in his presence, and against his will, by violence to his person or by putting him in fear of some immediate injury to his person, shall be adjudged guilty of robbery....

... It has been held that robbery embraces the same elements as simple larceny.... "Felonious" means that felonious intent which has been defined as an intent to deprive the owner not only temporarily but permanently, of his property....

In robbery, as in larceny, it is essential that the taking of the goods be *animo furandi*, and unless the taking be with felonious intent it is not robbery.

516 P.2d at 1026. These cases fully support the analysis of Idaho's statute set forth earlier in this opinion.

### 2

The state further contends that if we require a trial judge to instruct on the specific intent permanently to deprive, we will run afoul of a rule that the jury need only be given the language of a statute stating the offense. In support of this alleged rule the state cites the following cases: *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984); *State v. Herr*, 97 Idaho 783, 554 P.2d 961 (1976); *State v. Anstine*, 91 Idaho 169, 418 P.2d 210 (1966); *State v. Fedder*, 76 Idaho 535, 285 P.2d 802 (1955); *State v. Robinson*, 71 Idaho 290, 230 P.2d 693 (1951); *State v. Brooks*, 49 Idaho 404, 288 P. 894 (1930). With the exception of *Robinson*, none of these cases involves a robbery. Neither, in our view, does any of them establish a rule controlling the instant case.

---

**8.** A similar observation could be made concerning Idaho's former larceny statute. As we have seen, I.C. § 18–4601 defined larceny as a "felonious" taking. Companion section 18–4605 categorized larceny of $150 or less as petit larceny and section 18–4607 prescribed misdemeanor penalties for larceny in that category. If the word "felonious" in this context had been construed to signify a felony offense, as the state urges, there would have been no room for petit larceny or misdemeanor penalties in the statutory scheme.

**9.** The Kansas robbery statute later was amended to eliminate the common law elements of robbery. *See State v. Thompson*, 221 Kan. 165, 558 P.2d 1079 (1976).

In *Robinson,* the robbery case, our Supreme Court merely held that certain instructions on general criminal intent and on the reasonable doubt standard, pursuant to I.C. §§ 18–114 and 18–115, were correctly given. The Court was not asked to decide whether the jury had been properly instructed on the meaning of a "felonious taking" under the robbery statute. The case is inapposite here.

*Fedder* was a burglary case. There the Court held it sufficient to instruct the jury with the language of the burglary statute, which then referred to a "felonious" entry with "intent to commit larceny or any felony." *Fedder* plainly is distinguishable from the instant case. The burglary statute identified the specific intent required— an "intent to commit larceny or any felony." This identification of specific intent in the statute itself made an additional jury instruction for that purpose unnecessary. In contrast, Idaho's robbery statute simply mentions a "felonious taking" and contains no further description of the specific intent contemplated by that phrase.

The *Aragon, Anstine* and *Brooks* cases simply hold that it is "ordinarily" or "normally" sufficient to instruct the jury in the language of a statute. Similarly, the *Herr* case holds that instructing in statutory language is sufficient *if* the words found in the statute have a common meaning. These holdings are not inconsistent with the principle that where the statutory language contains a specific legal meaning not commonly understood, the jury must be instructed accordingly. *E.g., State v. Timmons,* 12 Wash.App. 48, 527 P.2d 1399, 1403–04 (1974) (legal definition of obscenity must be provided to jury).

The Idaho case that arguably comes closest to the rule urged by the state is one not cited to us: *State v. Huff,* 56 Idaho 652, 57 P.2d 1080 (1936). There a defendant convicted of robbery argued on appeal that both the prosecutor's information and the court's jury instructions were deficient because they failed to set forth the elements of larceny embraced by robbery. The Supreme Court, echoing its early decision in *People v. Butler, supra,* held that a charging document tracking the language of the statute was sufficient. Turning to the jury instructions, the Court acknowledged that intent to commit larceny is an element of robbery, as denoted by the phrase "felonious taking." The Court then narrowly held that reciting the statutory language would be deemed sufficient in a jury instruction absent a request for a more particular explanatory instruction. The Court noted that "[a]ppellant [had] requested no instructions and an omission to charge in greater detail upon the particular point cannot be assigned as error." 56 Idaho at 658, 57 P.2d at 1082.

*Huff* is of interest here because it confirms the larceny content of our robbery statute. But it offers no further guidance on the issue before us. In the present case, unlike *Huff,* the defendant *did* request an instruction. Olin's counsel asked the court to instruct the jury that the specific intent permanently to deprive the owner of his property is an essential element of robbery. The question of error in refusing counsel's request cannot be avoided in this appeal.

3

As a final defense of the trial court's action, the state contends that if a specific intent permanently to deprive is an element of robbery, prosecutors will be saddled with an "impossible burden" of proof. We are unpersuaded. As discussed above, this element long has existed in the common law of robbery, and it has been acknowledged in Idaho by our Supreme Court. It also has been part of the common law and Idaho statutes governing larceny or theft. Our reading of history does not suggest that prosecutors have found it unduly difficult to prove, or that properly instructed juries have been unable to find, the requisite specific intent upon direct or circumstantial evidence.

The state's position, in the final analysis, appears simply to be that a specific intent permanently to deprive the owner of his property *should not* be an element of robbery. Such a position is grounded in poli-

cy, not in existing law. It is more appropriately advocated to the Legislature than to us.[10]

It cannot be gainsaid that a defendant is entitled to proper instructions on every essential element of the offense charged. *E.g., State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Richardson,* 95 Idaho 446, 511 P.2d 263 (1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974). *See also* I.C. § 19-2132(a) (requiring trial courts to instruct juries "on all matters of law necessary for their information"). The trial judge in this case erred by refusing Olin's request to instruct the jury on the specific intent permanently to deprive. This conclusion leads to the next inquiry: whether the error is reversible or, as the state contends, is harmless.

### II

It is axiomatic that a criminal defendant is entitled to a fair trial, not to a perfect one. Errors not affecting the substantial rights of the defendant afford no occasion to disturb a judgment of conviction. I.C.R. 52. In this case, the state argues that even if the trial court erred by refusing to instruct the jury particularly on the element of specific intent permanently to deprive, the error did not affect Olin's substantial rights because the instructions as a whole adequately covered the subject of intent. The state also contends that the evidence against Olin was overwhelming and that no instructional error could have substantially affected the verdict.

### A

Jury instructions are not examined individually, but must be read collectively. *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984). Here, the trial court instructed the jury, by quoting the bare language of the statute, that robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." The court nowhere defined the crucial phrase "felonious taking." Nevertheless, the state argues that the specific intent contained in that phrase was clarified in other instructions. These other instructions, numbered 26 through 29, will be examined in turn.

Instruction No. 26 told the jury that they could not convict Olin unless they found a "certain specific intent." However, this intent was described as nothing more than "the specific intent to take personal property in the possession of another from his person or immediate presence, against his will, by means of force or fear." Thus, Instruction No. 26 merely coupled the words "specific intent" with a partial quotation of the robbery statute.

Instruction No. 27 stated that intoxication was "not of itself a defense in this case.... [T]he law does not permit [the defendant] to use his own vice as a shelter against the normal legal consequences of his conduct." This language was somewhat softened by Instruction No. 28:

[W]hen a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental intent essential

---

**10.** Chief Judge Walters similarly argues that robbery ought to mean what he thinks people assume it to mean. There is much to commend this idea in the abstract. But jury instructions must be based upon existing law, not upon a supposed plebiscite. My colleague goes on to suggest that the term "felonious" be redefined to signify nothing more than "wrongful," "unlaw-

ful," or "without color of right." This suggestion is best regarded as another invitation to legislative action. A common law term that is rich in historical meaning, that has been chosen deliberately by our Legislature, and that repeatedly has been recognized by our Supreme Court, should not now be judicially redefined to achieve a desired result in a particular case.

to constitute the crime or degree of crime with which he is charged.

Thus, Instruction No. 28 allowed the jury to consider intoxication when deliberating "specific intent," but it failed—as did Instruction No. 26—to tell the jury what "specific intent" they were required to find. Neither did Instruction No. 29 address the point. It merely said that "the intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used and the sound mind and discretion of the person committing the act."

In sum, although several instructions on intent were given, they utterly failed to apprise the jury that a "felonious taking" under the robbery statute requires, as a necessary element of the crime, the specific intent permanently to deprive the owner of his property. As we have seen, this element was not omitted from the instructions by inadvertence. Rather, it was purposely withheld, despite the request of Olin's counsel that it be included, because, in the district judge's own words, "I don't believe it is implicit in robbery that you have a larceny or theft involved." As explained in Part II of this opinion, the judge's view was erroneous.[11] Accordingly, the state's argument, that the element of specific intent permanently to deprive was covered by the instructions as a whole, must be

rejected. *Compare State v. Robalewski,* 418 A.2d 817 (R.I.1980) (holding in robbery case that instructions referring to intent but failing to mention specific intent to deprive are inadequate and require reversal).

**B**

The state's alternative argument, that no instructional error could have substantially affected the verdict, raises a more complex question. The prosecution's case against Olin was indeed a strong one. Some of the pertinent facts are recited in Part I of this opinion. The undisputed testimony showed that Olin, making no apparent attempt to conceal his identity, entered a convenience store, approached the clerk, pulled out a pistol, and said, "Empty the drawer." When the clerk hesitated, Olin cocked the gun, pointed it toward the clerk, and said, in essence, "Empty the drawer now or I'll blow your head off." After receiving the money, Olin ordered the clerk into a back room of the store and then departed. He was apprehended a short time later while driving on a highway. He offered no resistance. He told the arresting officer, "Okay, okay, you got me. I'm the one who robbed the liquor store." A loaded gun and a sack of money were found inside the vehicle.

11. Despite the trial judge's explicit refusal to instruct on the element of specific intent permanently to deprive, Judge Swanstrom argues in his separate opinion that this element was largely communicated to the jury. He notes that the instructions used the words "specific intent" and that Instruction No. 26 referred to a "specific intent to take personal property" against the victim's will, by means of force or fear. Relying on *People v. Banks,* 75 Ill.2d 383, 27 Ill.Dec. 195, 388 N.E.2d 1244 (1979), and *Litteral v. State,* 97 Nev. 503, 634 P.2d 1226 (1981), Judge Swanstrom equates an intentional taking with a specific intent to deprive. Upon this premise he contends that the instructions were deficient only in failing to mention the permanency of the deprivation. Then, relying on a law dictionary, he sets forth a definition of "permanent" deprivation and contends that Olin would have been found guilty even if such a definition had been furnished to the jury.

It is respectfully submitted that the analysis is flawed in several respects. First, it imputes

meaning to the jury instructions based on external legal sources not available to the jurors themselves. Second, it relies on authorities— the *Banks* and *Litteral* cases—that are wholly inapposite to robbery as defined in Idaho. *See* notes 4 and 6, *supra.* Third, by splitting the specific intent permanently to deprive into separate components of deprivation and permanency, and then equating deprivation with a taking, Judge Swanstrom's analysis disregards the common law's fundamental distinction between the general intent to commit a wrongful taking and the specific intent permanently to deprive the owner of the property taken. Finally, by concluding that Olin would have been convicted in any event, the analysis gives inadequate attention to the jurisprudential point, urged in Part II–B of this opinion, that jurors—not appellate judges—should decide in the first instance whether a necessary element of the offense charged has been proven beyond a reasonable doubt.

The defense presented evidence suggesting that Olin tended to be somewhat eccentric, as indicated by his choices of clothing. It has been noted that Olin testified at trial. He stated that on the day in question, he was too intoxicated to understand what he was doing or to form any particular intent. Other witnesses testified that Olin did not seem greatly impaired at the convenience store or at the scene of his arrest.

In light of this evidence, the state asserts that any error in failing to instruct the jury on the necessary element of intent permanently to deprive was harmless because a verdict of guilt would have been returned even if such an instruction had been given. In other words, the state urges us, upon reviewing a cold record, to step into the shoes of the jurors and to make a factual determination on an issue that never was submitted to them. This is a task fundamentally different from deciding, as we often do in harmless error cases, whether a factual determination actually made by the jury could have been affected by the erroneous admission of certain evidence, prosecutorial misconduct and the like.

Thus, the threshold inquiry must be whether failure to instruct the jury on an essential element of the offense charged is the kind of error that should be subjected to a harmless error analysis. This inquiry is distinct from, and not to be confused with, the question whether the error would be found harmless *if* a harmless error analysis were applicable. In many cases, it is all too easy to blur this distinction—to apply a harmless error analysis simply because a defendant's guilt seems clear. But this temptation must be resisted. In the present case the threshold inquiry—whether a harmless error analysis should be applied at all—is dispositive.

### 1

The inquiry begins by noting complementary but separate concepts of guilt in fact and guilt in law. Guilt in fact is established by evidence proving that the defendant actually committed the crime charged. Guilt in law is established when the finding of guilt in fact has been made by a duly constituted body in accordance with legally prescribed standards. American jurisprudence is concerned with process, not merely with result. Accordingly, the American judicial system focuses not only upon guilt in fact but also upon guilt in law. *See Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). As noted by Justice Frankfurter, the question before an appellate court "is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials...." *Bollenbach v. United States,* 326 U.S. 607, 614, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

Two constitutional provisions underlie our dual focus upon guilt in fact and guilt in law. The fourteenth amendment "protects the accused against conviction except upon proof beyond a reasonable doubt *of every fact* necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (emphasis added). The sixth amendment, applicable to the states through the fourteenth amendment, provides that the accused is entitled, in all serious cases, to have the finding of guilt or innocence made by a jury. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Accordingly, guilt in fact and guilt in law are established when every fact necessary to constitute the crime charged has been proven beyond a reasonable doubt and the finding of guilt has been made by a properly instructed jury.

When cases are reviewed on appeal, a tension exists between narrowly protecting the fourteenth amendment standard for establishing guilt in fact and more broadly protecting the sixth amendment right to a jury trial which is an important component of guilt in law. This tension gradually became manifest during the nineteenth and early twentieth centuries, when American appellate courts—emulating their English counterparts—reversed criminal judgments for virtually any legal error despite clear evidence of guilt in fact. This practice

eventually led to criticism in the United States of "revers[ing] judgments for the most trivial errors." R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 13 (1970) (hereafter Traynor). In *Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court—responding to federal legislation and to examples set by virtually all fifty states—attempted to impart greater balance to guilt in fact and guilt in law. The Court said:

> We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful.... We decline to adopt any such rule.... We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.
>
> ....
>
> Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction never can be treated as harmless error, this statement ... belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that "affect substantial rights" of a party.... [We hold] that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Id.* at 21–24, 87 S.Ct. at 826–827 (footnotes omitted).

Thus, the Court in *Chapman* adopted a harmless error standard but recognized that it would not apply to all kinds of error. The Court identified some instances in which error never could be deemed harmless (e.g., use of coerced confession, denial of right to counsel, and lack of an impartial judge). However, the Court did not articulate a broader conceptual basis for balancing the concerns of guilt in fact with those of guilt in law. In the words of one commentator, "The Court has failed ... to announce a coherent rationale as to which violations are to be reviewed by the strict 'automatic reversal' standard and which by the more lenient 'harmless error' standard." Note, *Principles for Application of the Harmless Error Standard*, 41 U.CHI.L.REV. 616, 616 (1974). Justice Traynor further observed that some errors in jury instructions might fall into the automatic reversal category and some into the harmless error category. Traynor at 64–74.

The Supreme Court did not respond broadly to these concerns. But on the particular subject of a defendant's right to have guilt determined by a jury, the Court took a significant step in *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). There the Court reaffirmed a pre-*Chapman* decision in *United Brotherhood of Carpenters and Joiners of America v. United States*, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947), holding that a trial judge is prohibited from entering a judgment of conviction, or from directing the jury to return a verdict of guilt, regardless of how overwhelmingly the evidence may point in that direction. With this pronouncement, the Supreme Court signaled that it was not enough merely for a defendant's guilt in fact to be determined in accord with the fourteenth amendment standard articulated in *Winship*. Rather, the defendant also was entitled to have the issues submitted to a jury in recognition of his sixth amendment right as interpreted in *Duncan*.

*Martin Linen* and *United Brotherhood* point to a distinction between error that removes necessary issues from consideration by the jury and error that causes the jury to receive improper information or statements of law concerning the issues submitted to them. In some instances, the latter kind of error might be found harm-

less without unduly abridging a defendant's right to have guilt determined by a jury. Thus, the United States Supreme Court has held that a harmless error analysis may be applied to a faulty instruction concerning the use of character evidence. *Torres-Valencia v. United States*, 464 U.S. 44, 104 S.Ct. 385, 78 L.Ed.2d 40 (1983) (remanding case for application of the harmless error standard). Similarly, the Idaho Supreme Court has held that the harmless error doctrine may be considered with respect to an incorrect "flight" instruction. *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978) (concluding that the error was not harmless). And our Court has held that a harmless error analysis may be applied to instructions on lesser included offenses where the error does not consist of misstating the elements of such offenses. *State v. Gilman*, 105 Idaho 891, 897, 673 P.2d 1085, 1091 (Ct.App.1983).

However, the courts have taken a profoundly different position regarding failure to instruct the jury on a necessary element of the offense charged. Such error removes an essential issue from the jury's consideration. It defeats the defendant's right to a trial by jury and diminishes the legitimacy of the eventual judgment as a determination of guilt in law. This kind of instructional error is not subject to a harmless error analysis. *See, e.g., Glenn v. Dallman*, 686 F.2d 418 (6th Cir.1982), *cert. denied*, 454 U.S. 843, 102 S.Ct. 155, 70 L.Ed.2d 128 (1981) (habeas corpus case); *People v. Butler*, 413 Mich. 377, 319 N.W.2d 540 (1982); *State v. Forsyth*, 197 Mont. 248, 642 P.2d 1035 (1982); *Koltay v. State*, 360 So.2d 802 (Fla.Dist.Ct.App.1978).

These decisions recognize the distinct, although complementary, functions of judges and juries. In a robbery case, for example, it is for the trial judge (and, ultimately for an appellate court) to say whether the state must prove a specific intent permanently to deprive the owner of his property. However, it is for a properly instructed jury to say whether the defendant actually had such specific intent. BISHOP § 840, at 639. The United States Supreme Court,

speaking through Justice Jackson, has observed:

> Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settled practice and its reason are well stated by Judge Andrews in *People v. Flack*, 125 N.Y. 324, 334, 26 N.E. 267, 270:
>
>> "It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury...."

*Morisette v. United States*, 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952). Although the Court in *Morisette* spoke of general criminal intent, its observation would apply *a fortiori* to specific intent. A question of specific intent always must be submitted to the jury with proper instructions.

### 2

The distinction between failure to instruct on an essential element of the offense and other kinds of instructional error has been brought into sharp focus by United States Supreme Court decisions since *Martin Linen*. In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61

L.Ed.2d 39 (1979), the Court held that the rule of *Winship*—requiring the state to prove beyond a reasonable doubt each and every fact necessary to constitute the crime charged—was violated by an instruction telling the jury that a person rebuttably was presumed to intend the consequences of his own acts. The Court viewed such an instruction as potentially shifting the burden of proof upon an issue of intent to the defendant, thus relieving the state of its burden to prove all elements of the crime beyond a reasonable doubt. Having held the instruction to be erroneous, the Court left open the question whether such error could ever be deemed harmless.

The Court attempted to answer this question in *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). In that case, four members of the Court, in an opinion written by Justice Brennan, declared that *Sandstrom* error never should be deemed harmless because an appellate court could not determine whether a jury relied upon a presumption or upon the underlying evidence for its determination of intent. This view was opposed by four other members of the Court, in an opinion authored by Justice Powell. The Powell opinion invoked the distinction between an instruction that embodies an erroneous presumption and an instruction that removes an issue completely from the jury's consideration. "Because the presumption does not remove the issue of intent from the jury's consideration," wrote Justice Powell, "it does not preclude a reviewing court from determining whether the error was 'harmless beyond a reasonable doubt.'" *Id.* at 97, 103 S.Ct. at 982 (footnote omitted). Justice Powell stated that the harmless error inquiry should be "whether the evidence was so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Id.* at 97 n. 5, 103 S.Ct. at 983 n. 5.

The potential harmlessness of *Sandstrom* error was considered again in *Rose v. Clark*, — U.S. —, —, 106 S.Ct. 3101, 3103, 92 L.Ed.2d 460 (1986). This time, the view espoused by Justice Powell commanded a majority. Writing for the Court in *Rose*, Justice Powell declared that *Sandstrom* error could be subjected to a harmless error analysis. In so holding, Justice Powell reiterated his earlier observation that such error is different from error that, in essence, withdraws an essential issue from the jury. Justice Powell quoted what he had written in *Johnson:*

> "Because a presumption does not remove the issue of intent from the jury's consideration, it is distinguishable from other instructional errors that prevent a jury from considering an issue." *Connecticut v. Johnson*, 460 U.S. at 95, n. 3 [103 S.Ct. at 982 n. 3] (Powell, J., dissenting). Cf. *Jackson v. Virginia*, 443 U.S. 307, 320, n. 14 [99 S.Ct. 2781, 2790 n. 14, 61 L.Ed.2d 560] (1979) (suggesting that failure to instruct a jury as to the reasonable-doubt standard cannot be harmless).

*Rose* 106 S.Ct. at 3107 n. 8.

Three members of the Court dissented in *Rose.* However, they accepted Justice Powell's view that taking an issue from the jury is the kind of error that cannot be subjected to a harmless error analysis. In an opinion written by Justice Blackmun, they argued that *Sandstrom* error was virtually equivalent to taking an issue from the jury and that it, too, should be excluded from a harmless error analysis. There may be considerable merit in the dissenters' view on *Sandstrom* error. But regardless of which view is deemed more persuasive, the important point here is that in *Johnson*, and again in *Rose*, the Supreme Court was virtually of one mind that failure to instruct the jury on a necessary element of the crime charged cannot be subjected to a harmless error analysis.

This point has been reiterated in *Cabana v. Bullock*, — U.S. —, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). There, the Court held it permissible for an appellate court to make a ruling from the record on whether the defendant in a felony-murder case intended a killing to occur, as required for imposition of the death penalty under *En-*

*mund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The Court, in a majority opinion authored by Justice White, stated that the right to a jury determination of factual issues is limited to the adjudication of guilt or innocence; it does not carry over to sentencing. The Court reemphasized a defendant's right to have a jury determine factual issues relating to the adjudication of guilt:

> A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence ... and *a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard approved.... Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime.*

106 S.Ct. at 696 (emphasis added).

These Supreme Court cases clearly support the decisions cited earlier, holding that failure to instruct a jury on the necessary element of specific intent permanently to deprive an owner of his property should not be subjected to a harmless error analysis.[12] Accordingly, the trial judge's error in the present case cannot be dismissed as harmless. If this conclusion were joined by a majority of our Court, the judgment of conviction would be vacated and the case would be remanded for a new trial.

Such an outcome might be disfavored by those who place greater weight on result than on process in our criminal justice system. Indeed, the state has argued that failure to apply the harmless error doctrine in this case would "make the outcome of criminal cases depend on hypertechnicality." This contention has been answered by Justice Frankfurter: "All law is technical if viewed solely from concern for punishing crime without heeding the mode by which it is accomplished." *Bollenbach v. United States,* 326 U.S. at 614–15, 66 S.Ct. at 405–06.

WALTERS, Chief Judge, concurring in part and dissenting in part.

I agree with Part I of the lead opinion, upholding the sufficiency of the evidence to support the jury's finding that Olin displayed an operable firearm during the commission of the robbery. However, with respect to Part II, I am not persuaded that the district court erred in refusing to give Olin's requested instruction. For that reason, my vote is to affirm the judgment of conviction.

It is well settled that robbery was recognized as a crime at common law. In fact, LaFave points out that the crime of robbery was created before that of larceny. W. LAFAVE & A. SCOTT, HANDBOOK ON CRIMINAL LAW § 94 at 692 n. 1 (1972). As noted in our lead opinion in the instant case, many courts have engrafted onto the crime of robbery all of the elements that later were developed in respect to the crime of larceny, including the element that the taking of property must be with a specific intent to deprive the owner of the property permanently. Case law and statutory law show that the "owner" characteristic has been changed to include not only owners, but any person who is in possession of the property. The "permanency" aspect has also changed, to include

---

**12.** Some cases hold that failure to instruct on a necessary element may be harmless if the element in question has been conceded by the defendant, either by stipulation or by the plain thrust of his own evidence. *E.g., Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); *People v. Ford,* 60 Cal.2d 772, 36 Cal.Rptr. 620, 388 P.2d 892 (1964). Those cases plainly are inapposite here. Moreover, failure to instruct must be distinguished from failure to elaborate upon an element already contained in jury instructions. In the latter situation, it can-

not be said that the issue has been withheld from the jury. Thus, in *State v. Brill,* 21 Idaho 269, 121 P. 79 (1912), our Supreme Court, noting that the jury had been adequately instructed on the law of robbery, treated as harmless error the trial court's refusal to add another instruction stating that the defendant could not be guilty of robbery if he merely took possession of his own property. The Court further observed that the defendant had not even contended at trial that the property in question belonged to him.

temporary deprivation—at least to the extent that a taking and holding of the property for an unreasonable length of time may suffice for the "deprivation" element.

Apparently, whether "robbery" is a crime embodying the specific intent attributed to larceny depends upon if the legislative enactment fortuitously includes (or excludes) the adjective "felonious." In some states where that word does not appear in the statutory language defining the crime of robbery, courts have held that the specific intent to deprive an owner of property—required by larceny—is not required for robbery. *See, e.g., People v. Moseley,* 193 Colo. 256, 566 P.2d 331 (1977); *People v. Meeks,* 542 P.2d 397 (Colo.App.1975); *People v. Banks,* 75 Ill.2d 383, 27 Ill.Dec. 195, 388 N.E.2d 1244 (1979); *State v. Thompson,* 221 Kan. 165, 558 P.2d 1079 (1976); *Litteral v. State,* 97 Nev. 503, 634 P.2d 1226 (1981); *Traxler v. State,* 96 Okl.Cr. 231, 251 P.2d 815 (1952). On the other hand, the Florida Supreme Court has held that, notwithstanding omission of the word "felonious" from Florida's statutory definition of robbery, the specific intent to deprive an owner of his property is a requisite of the crime of robbery. *See Bell v. State,* 394 So.2d 979 (Fla.1981). Other states, as noted by the lead opinion, have determined that robbery is a crime of specific larcenous intent where robbery is defined by statute as involving "felonious" conduct. Thus, it may seem anomalous to a citizen on the street that simply taking money from a store clerk at gunpoint may constitute the crime of robbery in one state but the same conduct in another state will not be punishable as a robbery.

Given these divergent views and in light of the historic metamorphosis through which the crime of robbery has evolved, it seems to me that the crime of robbery is no longer critically dependent upon a specific intent to deprive the owner of property. Rather, in the commission of that crime, it is the *means employed* that the law denounces. *See, e.g., State v. Phillips,* 62 Idaho 656, 115 P.2d 418 (1941). A similar conclusion was reached by the Illinois court in *Banks.*

"... what is essential to the offense of robbery ...: depriving a person, in his or her presence, of property, through force or intimidation. As a matter of policy, we do not think the duration of the deprivation is pertinent nor intended to be so by the legislature. (Citations omitted.) The various definitions of 'deprivation' or 'deprive' emphasize this; for example, Webster's Third New International Dictionary 606 (1971) defines 'deprive' as 'to take away: remove, destroy; to take something away from: divest, bereave; ... to keep from the possession, enjoyment, or use of something.' Black's Law Dictionary 529 (rev. 4th ed. 1968) defines 'deprive' as '[t]o take ... a taking altogether, a seizure, a direct appropriation, dispossession of the owner.... It connotes want of consent.' What is relevant then is the substantial interference, temporary or permanent, with property rights without consent. And what is intended by the legislature is 'to prevent the use of force and threats against persons as a means of inducing them to part with their property. The intent to steal may include the intent to permanently deprive but is not limited to it and extends to the taking away, stealing, or even preventing the owner from his or her continued and free enjoyment of his property.' (M. Bassiouni, Criminal Law 336–37 (1978) )."

388 N.E.2d at 1247, *quoted in Litteral v. State, supra,* 634 P.2d at 1228. In this regard, I agree with the district judge below; it is the taking of property by means of force or fear that constitutes the offense of robbery.

I am also not persuaded that we need to lend any new definition to our robbery statute. I find it curious that the legislature of Idaho has never deemed it necessary to define robbery with such specificity that the crime should explicitly include all of the elements of larceny. Our robbery statute predates statehood. In 1864, the territorial legislature declared:

Robbery is the felonious and violent taking of money, goods or other valuable

thing, from the person of another, by force or intimidation.

1864 Idaho Sess. Laws § 60 at 447. The statute was revised somewhat in 1887. That year the legislature adopted Revised Statute § 6590, which now appears as I.C. § 18–6501. The statute reads:

Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

I suspect that our legislature (let alone the Valley County jury and the victim in this case) would be greatly surprised to learn that the defendant Olin may not have committed a robbery, as that crime has been statutorily defined by the lead opinion. Here, the store clerk testified that Olin entered the establishment, pointed a pistol at her face, cocked back the hammer and said "Empty the drawer now or I'll blow your head off." She began emptying the cash drawer of her till, beginning with one- and five-dollar bills. As she got to the ten-dollar bills, he said "Put it in a bag." She grabbed a paper sack to put the money in and he said "Hurry up. Get the twenties. Hurry up." After she put the twenty-dollar bills in the sack she asked him if he wanted the change and he said "No." He then escorted her to a back room and told her to stay there. He told her, "Don't come out or I'll blow your head off." When Olin was later arrested by the police, he was in possession of the sack of money and the sack contained $776.00. As he was accosted by the police, Olin stated "Okay, you've got me. I'm the one who robbed the store."

Testifying on his own behalf, Olin admitted he entered the store, pointed a gun at the clerk and asked her for the money. In answer to a question by his counsel, if Olin went into the store "with the intent to rob that store," Olin responded: "I had no idea why I was in there." He also denied that, on the day in question, he had planned to rob the store. Olin testified that he was drunk when the robbery occurred.

Consequently, because of Olin's representation that his intoxication prevented him from formulating a criminal intent, Olin requested the court to include in the definition of the crime of robbery, that the specific intent necessary to constitute the crime of robbery is the specific intent to permanently deprive the person of that property, viewing robbery as nothing more than larceny accomplished by means of force or fear. The court refused Olin's request. The court ruled:

I think the larceny or the theft portion of the statute includes its own definition of what constitutes a theft when the property is taken from a person of another. As a matter of fact, it makes it grand theft, no matter what the value of the property might be when it is taken from the person of another.

It doesn't say anything about force or fear. I don't believe it is implicit in robbery that you have a larceny or a theft involved. I think you can have robbery, in other words, when the intent is maybe even giving the personal property back to somebody in the future at some time. It's a taking by means of force or fear that constitutes the offense of robbery.

The court thus instructed the jury:

### Instruction No. 24

Robbery, as charged in Count I of the Information, under the laws of the State of Idaho, is defined as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

### Instruction No. 26

In the crime of Robbery with which the Defendant is charged in Count I of the Information, there must exist a union or joint operation of act or conduct and a certain specific intent.

In the crime of Robbery there must exist in the mind of the perpetrator the specific intent to take personal property in the possession of another from his

person or immediate presence, against his will, by means of force or fear. Unless such intent so exists that crime is not committed.

## Instruction No. 27

Our law provides that "no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition."

This means that drunkenness, if the evidence shows that the defendant was in such a condition when allegedly he committed the crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal legal consequences of his conduct.

## Instruction No. 28

However, when a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

If from all the evidence you have a reasonable doubt whether the defendant was capable of forming such specific intent or mental state, you must give the defendant the benefit of that doubt and find that he did not have such specific intent or mental state.

## Instruction No. 29

The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used and the sound mind and discretion of the person committing the act.

■ I believe the instructions given by the court adequately covered the issues in this case. A person of common understanding certainly could conclude that the events transpiring in this case showed that a robbery—both in fact and in law—occurred. If it is necessary to engraft any additional definition or interpretation onto the legislature's declaration making "felonious" taking of property from another, against his will and by means of force or fear, a crime, it should be sufficient to simply equate "felonious" with "wrongful," "unlawful" or "without color of right." Such an approach would allow an accused to present any defense or excuse that might show such matters as (a) the taking was under an honest, though mistaken, claim of ownership of, or claim of a lawful right to possess, the property; or (b) through the perpetration of a prank or practical joke; or (c) in honest belief of collection of a legitimate debt; or (d) by authority in the discharge of public duties by a public officer; or (e) in the case of seizure of dangerous weapons, to prevent harm or injury by the possessor of such instruments. The evidence in this case presented none of these defenses or excuses or any similar defense. Furthermore, as noted by the special concurring and dissenting opinion of Swanstrom, J., *infra,* inclusion of any instruction relating to specific intent to deprive would not, from any reasonable view of the evidence, result in any different verdict upon the facts as they were presented to this jury. Not being convinced that the district court erred in refusing to give the defendant's instruction, I vote to affirm the conviction for robbery.

SWANSTROM, Judge, concurring in part and dissenting in part.

■ I concur in Part I of the lead opinion. I also agree with the holding in Part II that the crime of robbery in this state

534

embraces the common-law crime of larceny. The elements of the crime of robbery necessarily include all the elements of larceny as that crime was formerly defined in this state. One of the elements common to the crimes of larceny and robbery is the "specific intent to permanently deprive the owner of his property." *State v. Jesser*, 95 Idaho 43, 501 P.2d 727 (1972); *State v. Hurst*, 36 Idaho 156, 209 P. 724 (1922).

■ Thus, I agree there was error in the instructions given. However, I also believe the error can be classified as harmless in this case. Therefore, I will briefly explain where I disagree with Part III of the lead opinion. Jury instruction No. 26, stating what requisite specific intent must be found, admittedly does not contain the historically accepted language used in *Jesser*. The instruction was deficient, in one respect discussed later. Nevertheless, it cannot be said that there was any *absence* of instruction on the element of specific intent. As the dissenting opinion of Chief Judge Walters discloses, several instructions required the jury to consider this element. It is my belief that this is *not* a case where there was a failure to instruct on one of the necessary elements of the crime. The error in this case, rather, is similar to those which the United States Supreme Court said in *Rose v. Clark*, — U.S. —, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), *might* be considered harmless.

As I read it, *Rose* would allow and even encourage the harmless error analysis to be made here. In this analysis we are permitted to determine what the probable effect of the instructional error may have been. Let us compare the instruction given:

> In the crime of Robbery there must exist in the mind of the perpetrator the specific intent to take personal property in the possession of another from his person or immediate presence, against his will, by means of force or fear. Unless such intent so exists that crime is not committed.

with the instruction requested by Olin:

> In the crime of robbery of which the defendant is accused, a necessary element is the existence in the mind of the defendant of the specific intent to permanently deprive the owner of his property.

When viewed against the undisputed evidence in this case, there is no significant difference between the phrase:

> [T]he specific intent to take personal property in the possession of another ... against his will, by means of force or fear,

and the phrase:

> [T]he specific intent to ... deprive the owner of his property.

For all practicable purposes the specific intent expressed in the first phrase embraces the specific intent spelled out in the second phrase.

In this instance at least, "deprive" is not a word of art requiring a special definition. "To deprive" means simply "to take away" from another. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 606 (1976). "It connotes want of consent." *People v. Banks*, 75 Ill.2d 383, 27 Ill.Dec. 195, 388 N.E.2d 1244, 1247 (1979) *quoted in Litteral v. State*, 97 Nev. 503, 634 P.2d 1226, 1228 (1981). *See* opinion of Walters, C.J., *supra*. In the present case, if the state has proven a "specific intent to take personal property in the possession of another ... against his will, by means of force or fear," then surely it has proven also "the specific intent to deprive." What, then, is missing from the court's instruction No. 26? It is the word "permanently."

To "deprive permanently" means to: (a) Take from the owner the possession, use or benefit of his property, without an intent to restore the same; or (b) Retain property without intent to restore the same or with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return; or (c) Sell, give, pledge or otherwise dispose of any interest in property or subject it to the claim of a person other than the owner. BLACK'S LAW DICTIONARY 398 (rev. 5th ed. 1979). Did the absence of this word

affect the outcome of the trial? I think it did not. Here, the compelling evidence presented by the state established Olin's specific intent to deprive the owner of his property permanently. The evidence strongly suggests there was no intent on Olin's part *when the crime was committed* "to restore" the property taken at some future time. There can be no serious question that the state's proof convincingly established the requisite specific intent. Indeed, this is one of those situations where the defendant can hardly be heard to say otherwise, or, if he says it, his statements will fall on disbelieving ears.

Here, there is no need to pause over the distinctions between intending to take from the *owner* and intending to take from another person who is merely in possession. The state has never been required to prove that the robber knew who the owner of the property was. In this regard, it is sufficient for the state to prove the *defendant* was not the owner of the property or entitled to possession. The undisputed evidence showed that Olin had no possessory or ownership right to or interest in the property taken.

The only evidence which was offered to show the absence of the requisite specific intent was the evidence of Olin's intoxication. The jury was fully instructed on that defense. No error is alleged in those instructions. The jury obviously rejected the argument that Olin's intoxication prevented him from forming the specific intent to deprive the owner of his property. The ultimate question is: Would the jury have reached the same conclusion if they had been told the state needed to prove Olin intended to *permanently* deprive the owner of his property? Olin's alleged intoxication does not help him here. The jury found Olin had the ability to form, and did form, the intent to deprive. No reason is shown in the evidence or by the arguments why Olin would have had any less ability to form the intent to deprive the owner of his property "permanently."

Aside from intoxication, there was no explanation given why Olin was acting like a robber and talking like a robber. Without some suggestion in the record indicating why a juror might believe reasonably that Olin intended to deprive the owner of his property *only temporarily*, I believe the instructional error was harmless beyond any reasonable doubt. Accordingly, I vote to affirm.